Thank you, Your Honors. May it please the Court, Brent Mead representing the State Defendants, I'd like to reserve five minutes for rebuttal. This Court should reverse the District Court on all counts. First, the District Court failed to apply the proper presumptions against preemption on the ADA and OSHA claims. On the ADA, the District Court enjoined Montana's law without an actionable ADA claim in front of it. On OSHA, the District Court ignored the Supreme Court's guidance in NFIB in the plain text of the statute to find a vaccination requirement lurking in the General Duty Clause. On the Equal Protection claim, the District Court erred by creating a new bright-line test the State can only forward a single interest under rational basis. That ignores volumes of precedent. Once this Court considers the State's express reasons for the classifications in 702, the law easily survives review. These errors were compounded by the irregular procedure below. First, discovery was done in a highly compressed fashion over a couple of months. Summary judgment briefs were done one week after the close of discovery. The District Court terminated those summary judgment briefs without ruling on them, and the District Court did not ask for or require legal briefs post-trial. But, that said, there are a couple facts that underlie all the claims in this case. First, the institutional plaintiffs, the physician offices, and the hospital required few, if any, mandatory vaccinations prior to Montana's law. For example, the Montana Nurses Association collectively bargained for no mandatory vaccinations. Second, before COVID, State and Federal regulators, when they surveyed health care settings, they did not investigate a facility's vaccination policy or look to what vaccinations were required by staff. Third, all of the institutional plaintiffs freely granted exemptions from their required vaccines, and they all acknowledged they employed unvaccinated individuals prior to House Bill 702. And fourth and finally, House Bill 702 does not prevent uniform measures. It only prevents discriminatory actions based on vaccination status. So, for example, a health care setting can require all employees to wear masks without running afoul of Montana's law. So, on these facts, both on their face and in their inconsistencies, reversal is warranted. So, I'll turn first to the ADA. The district court at 1ER26 viewed this case as an impossibility of compliance case, and that is simply contradicted by the record. For example, Five Valleys Urology, they testified that they had one individual who requested a leave of absence because they were immunocompromised. That leave of absence was granted. Another employee requested to work in a segregated environment. That request was also granted. So, simply on those facts, it was not impossible to comply with both the ADA and 702 in those cases. That's been the state's point throughout, that the ADA and 702, when you're looking at how they interact together, that must be a case-specific, individualized determination. It can't be done, as the district court did, on an assumption that 702 prohibits compliance with the ADA in all cases. Go ahead. We're kind of at both ends of the spectrum, like an anecdote over here and a hypothetical impossibility over there. So, I just want to ask you about one of the district court's findings, where they said that to accommodate the immunocompromised patient, you must be able to know the vaccination status of an employee. Is that incorrect? Two things on that, Your Honor. One, I don't think that that is necessary in the case of Five Valleys Urology, that it's not necessary to investigate the vaccination status of third parties to do what Five Valleys did in that case. That that's the state's point, is you don't need to take that next step of discriminating against third parties based on their vaccination status. And second, the district court ignored the variance within the vaccination policies. So, for example, Western Montana Clinic, they testified they never tracked vaccinations like MMR or Tdap. Five Valleys Urology did not require any mandatory vaccinations and instead their positions go to a hospital setting. They relied on the hospital. They did not themselves impose anything. And so I think the district court just assumed too much there on the knowledge. And second, you had inconsistent testimony between the plaintiffs themselves. Western Montana Clinic testified that if an employee declined their flu vaccine, that that gave Western Montana Clinic knowledge of that person's vaccination status. Providence testified the opposite. And so I think that's what the state's getting at with some of the Rule 52 issues, are that there's inconsistent testimony among the plaintiffs that the district court did not enter clear findings on. But just to take a step back, the way I was understanding the district court's injunction was that it applied not just to the plaintiffs here but to all health care settings. So these plaintiffs are, you know, one piece of that overall health care setting in your state. So, yes, Your Honor, and I think that that's the error because it goes to what the state's been arguing all along, is that in the ADA you need to take specific cases to see if an individual can be accommodated short of inquiring into the vaccination status of a third party or treating that third party differently. The state has left the door open that in a specific case, if the only reasonable accommodation available to that immunocompromised individual requires differential treatment, then that's an affirmative defense to any hypothetical 702 enforcement action that comes along. So you would never get to impossibility under that theory? I don't think so, Your Honor, because under Wyeth and Playa that's the state's argument, is that under those cases the supremacy clause can be used as an affirmative defense if the state were to seek an enforcement action. I'm not sure you need to go that far. I mean, it seems to me that that's one way in which it could come up. There might be other as-applied challenges that could be brought outside of an affirmative defense context, but this is a broader challenge, it's a facial challenge, so that's different. Your Honor, on preemption to the ADA, I don't think that that broader challenge is appropriate because what we're talking about specific to 702 is the state's historic police powers to prohibit discrimination, or if you want to view it differently, the state's police powers over vaccination policies. And the presumption is that those historic powers are left undisturbed unless Congress clearly intended to preempt them, and I don't think that you can draw that clear intent to preempt them here when in some cases 702 protects the same individual as the ADA. If someone is immunocompromised and because of that status they're unvaccinated, well, 702 protects them just the same. So on the Title III claims, I do just want to highlight that the two individuals who testified at trial, both of them testified explicitly that they have never requested an accommodation. The district court committed clear error on that factual finding to say that they requested an accommodation. The district court also incorrectly relieved the plaintiffs of their burden under Title III. What we're talking about is public accommodations. We're not talking about a state policy. And the district court relieved the plaintiffs of their burden to show that a public accommodation employs a discriminatory policy or practice. They never identified what that policy or practice is in this case, and the district court was wrong to preempt a state law without meeting that essential element. So next I'll turn to the OSHA claim. The district court did correctly find that no specific federal standard preempts 702, and that's at 1 ER 31. The only standard at issue was the hep B vaccination standard. That should have ended the preemption inquiry because Congress's clear intent under OSHA was that if a federal standard is in place, all state law is preempted, whether it's complementary or more protective, it doesn't matter. It is an express preemption. But where a federal standard does not exist, state law is saved under 667A, and that's what happened in the Ramsey-Winch case. So even in a case where in that case it was workplace violence as a recognized hazard, OSHA declined to issue a specific standard on that issue, and because of that, the employer in that case, it didn't follow that the general duty clause could preempt Oklahoma's law, again, because Oklahoma's law in that case was an exercise of its historic powers. Here, OSHA, when it promulgated its COVID-19 ETS, it considered all the arguments the plaintiffs are raising before this court, that there are inconsistent state laws. There are some laws like Montana's that protect someone's right to refuse a vaccination. It also considered the feasibility of abatement for employers. It considered that non-mandatory guidance from the CDC did not create a legal obligation under the general duty clause. So all of the arguments plaintiffs raise here were considered and rejected by the secretary in that ETS. That's why the secretary viewed an ETS as necessary, because they could not enforce a vaccination standard through the general duty clause. And so the necessary implication of that is Montana's law must be saved under that, because if a specific standard does not preempt Montana's law, then the general duty clause can't operate in the background to do the same thing. But the general duty clause could still be enforced by OSHA? Yes, Your Honor, and I think as OSHA has recognized, it is a significantly higher burden for OSHA to pursue that. But in this case, the vaccination policies that we cite in the record, those all predate 702, and there is nothing in the record that OSHA ever sought a general duty clause enforcement action against those vaccination policies before 702. So there's nothing to suggest that the secretary has ever intended the general duty clause to be used in this way. Again, I think that goes to the HEP-B standard and the COVID-19 ETS that the times OSHA mentions vaccination, it is designed as a voluntary program, not as a mandatory program. On the equal protection claim, the district court, it simply ignored the state's reasons for the exemption, so 3B and then 313. In Gallinger, in this court, it made clear that the court should focus on the reason for the classifications, not the underlying reason for the law. And so that tracks with what the governor's mandatory veto did. We added the 313 facilities because in 2021, we could see the data that was coming down. Those facilities like nursing homes that have a vulnerable population in a congregate setting were suffering disproportionate mortality rates. And so we also had good reason to believe that CMS was going to come down with new regulations on those kinds of specific facilities. CMS did that a couple weeks later. That was entirely rational for the state to look at what was likely to happen and look at the mortality rates of those facilities were suffering that weren't suffered by other healthcare settings and treat them differently. And second, we could look to healthcare facilities compared to physician offices and look at that healthcare facilities, so hospitals and the like, they treat patients in somewhat more intensive settings. They have more strict healthcare infection protocols. They have things like NICUs. So the state could reasonably look at those facilities and say, we are going to treat them differently than we treat physician offices, which are a simple professional license. I had some trouble with your argument on the similarly situated, which of course doesn't answer the second part, whether in any event, even if they're similarly situated, there's a rational basis for that. And that's because if you really look at the patients who are being treated, there is a certain fluidity between hospitals, physicians' offices, and others. So the state argument, as I read it, was, well, we have different licensing and regulatory. And I have to tell you, that didn't really bowl me over as a basis for saying that they aren't similarly situated. So I'd appreciate if you could respond to that. Yes, Your Honor. So certainly there are patients who go between the facilities, but they are distinguishable based on, so Western Montana Clinic and Five Valleys, they're outpatient clinics. They don't have overnight beds. And so it's not just that an individual patient could go between the facilities at different points in their care. It's that the facilities themselves are designed to do different things. And so an outpatient clinic is not similarly situated to a hospital because they just don't have the same kind of specs, if you will, that they don't offer the overnight beds. And certainly compared to a nursing home, they don't have the same residential services. They don't have the same sort of congregate setting there. Unless Your Honors have further questions, I'll reserve for rebuttal. Okay, thank you, Mr. Mead. May it please the Court. My name is Katie Mai, and I'm arguing today on behalf of the appellees in this case. This case presents a straightforward application of federal preemption and constitutional principles to a very unusual state law. Montana Code Annotated 49.2.312, by virtue of the way that it was drafted, interferes with the reasonable accommodation process, makes health care workplaces less safe, and unconstitutionally discriminates against certain health care settings, patients, and their employees. Section 312 is much broader than vaccine mandates and COVID-19. This law prevents health care settings from treating employees differently in any manner based upon immunity status, regardless of how derived, for any communicable disease. As found by the District Court, this law prevents health care settings from utilizing the most critical tool in infection prevention. The District Court's conclusions necessarily follow from its factual findings, which were largely uncontroverted at trial and appear not to have been seriously challenged on appeal. Let's look at the law itself. This is not a law that furthers public health. After a full trial on the merits, the District Court correctly found that this law, in fact, makes health care settings less safe. The limited exceptions and exemptions to the statute, on the one hand, do not save it from preemption and, on the other, create the unconstitutional treatment of the similarly situated classes. While Section 313 provides an exemption to the prohibitions of 312 for nursing homes, long-term care facilities, and assisted living facilities, this allows them to comply with CMS and CDC guidance and regulations without fear of civil or criminal penalties, but there is no such exemption for physician offices or health care facilities, including hospitals. Let me just tell you my concern with the ADA. What the District Court did, as I understand it, was enjoin the law in all health care settings and so essentially held that the law was facially invalid, at least as to this population of people across the board. And the concern I have is whether the findings support that because there's all kinds of different situations out there in which an accommodation request might or might not be reasonable. There might be other situations in which the request could be accommodated in other ways short of discriminating against somebody on the basis of vaccination status. So how does this record support the scope of the District Court's injunction? Because what 312 does is it removes the ability to even know the immunity status of the other employees. So if you have a disabled patient or employee who comes and needs to limit exposure to nonimmune individuals, what 312 does is it prohibits the employer, the health care setting, the public accommodation from even knowing that status, even being able to ask, even being able to look at a reasonable accommodation. Okay, but why does that tell us that there can't be other accommodations made in any given case? Well, I think that's asking us to prove a negative, which I believe that we did at trial, which is there is no other reasonable accommodation that would be effective. It was undisputed at trial that masks do not prevent blood-borne pathogens and that there was their own expert testimony that masks sometimes are not effective. So there is no other accommodation for somebody who has to avoid contact with nonimmune individuals. And we're not talking about a vaccine mandate here. We're talking about a situation where you can't reassign them. You can't tell them that they need to wear a mask or wear additional PPE in this particular environment. You can't do anything in any manner based on their immunity status, which is consistent with the District Court's findings. They're factual findings. The District Court found that hospitals and physicians treat and employ individuals that are disabled and immunocompromised, that those individuals are at an increased risk of harm from contracting vaccine-preventable diseases, and that institutional appellees received accommodation requests and individual plaintiffs asked to be accommodated by being treated by vaccinated staff. Mr. Mead made a statement up here that none of the individual plaintiffs had testified that they requested an accommodation, and that's not true. Ms. Page testified that she asked the receptionist at her oncologist's office if she could be treated by vaccinated staff and was told, we cannot tell you one way or another. Once those ADA's protections are triggered, the health care settings need to, one, know the immunity and vaccination status of the other employees that are around, and, two, be able to take action based on that knowledge to effectuate a reasonable accommodation. Section 312 wholly prevents physician offices from engaging in this process at all. Under 312, they are not allowed to know the immunity status of their employees, and they are not allowed to treat their employees differently in any manner based on immunity status, no exceptions. How about with respect even to the health care facilities that are partially exempted, where you're allowed to ask them, and if they don't respond, you can then assume that they're not vaccinated and you can take other accommodations. How is the District Court's injunction appropriate, even as to a part of the statute that seems on its face to have an accommodation component to it? The accommodation component in that exception runs to the non-immune individual. So the only way that that exception applies, the only way the hospital is free from the prohibitions of 312, is if they ask the immunity status, and then, two, if they implement reasonable accommodation measures to the non-immune individual. That's how the statute is drafted. That's the plain language of the statute. So if you have a situation, let's take an immunocompromised disabled baby in a NICU, and you have a provider who is not vaccinated and not immune for pertussis, you have to remove that provider from that care interaction. There is no reasonable accommodation to give to the provider, the non-immune person, and therefore you're stuck violating 312. You're not under that exception. 312 placed the appellees in an untenable position of either complying with the ADA or complying with the state law. The district court correctly concluded there was an irreconcilable conflict and that preemption was warranted. The district court also correctly concluded that the general duty clause of the OSH Act preempts 312 because of the specific workplace hazard in health care settings of vaccine-preventable diseases. The district court found that while the risk of exposure is not necessarily unique to health care settings, it is different from the public exposure because the risk is an inherent and immutable aspect of a health care worker's job. These findings were supported by the factual record, and appellants cannot show that this finding was illogical, implausible, or without support. Because the appellants cannot escape the fact that, one, the general duty clause applies, and, two, 312 conflicts with it, they try to argue that the general duty clause cannot preempt state law. This argument ignores the basic principles of conflict preemption and would essentially eviscerate the general duty clause. This analysis is the same. So you're suggesting the general duty clause can be enforced in the absence of OSHA regulations? In this particular case, yes. The whole purpose behind this sentence — Why would this particular case be different from any other case? Because this standard set by the state directly conflicts with the general duty clause. How does it conflict with the general duty clause? Because it makes health care workplaces less safe. Well, why wouldn't that be true in any other situation as well? I mean, if the general duty clause can be enforced here by the federal courts in the absence of OSHA regulations, why wouldn't the general duty clause just be generally enforceable by the judiciary? Well, because in this particular setting there was a factual finding that it is an inherent immutable aspect of a health care worker's job, vaccine-preventable diseases are. And so once there's that specific finding to that specific workplace, then the general duty clause controls. It's sort of like the Donovan case, right, where OSHA came in and enforced the general duty clause and said, hey, employer, you can't not mandate that your — But that's an enforcement action by OSHA. That's very different from a private citizen suit that forces the judiciary to come in and supervise the workplace. Correct. But if you had a state statute that said you can't know the status of your employees as to whether or not they're wearing seatbelts, you can't do anything against them if they're not wearing seatbelts. It sounds like it might be a good opportunity for OSHA to step in or to adopt regulations. Well, potentially. But that's not the case that we have here. What we have here is a direct, inair-reconcilable conflict. And do you have any cases in which the judiciary has stepped in in the absence of OSHA action? Well, no, Your Honor, we don't. But in the Ramsey case, the court at least indicated that that was a possibility, that the general duty clause can act to preempt state laws if they are not consistent with the general duty clause. But I don't see how this is consistent with that 667A provision. That seems to foreclose this argument. Well, 667A, the whole purpose of that savings clause was to allow states to innovate in the area where OSHA has not spoken into further workplace safety. Here we have, again, this very unusual state statute, which makes workplaces less safe. Right, but OSHA hasn't spoken, right? Correct. That's correct. So what is doing the preemptive work here? I mean, I'm just not aware of any case that said this general duty clause can go ahead and preempt a state law notwithstanding 667A in the absence of any OSHA regulation. Well, all of the cases that we're discussing, all the cases that usually come up, are cases where the standard does not conflict with the general duty clause in and of itself. And that's what we have here. Because typically, states are passing laws that are trying to make workplaces more safe for their workers, not less safe. And that's the problem that we have with this particular law. Removing the essential tool of a knowing immunity status and vaccinations interferes with the ability to comply with the general duty clause and acts as an obstacle to it. Would a decision by this court on your OSHA theory, would that suggest that employers were obligated to check on the vaccination status of their employees? No, because remember, this statute doesn't just apply to vaccination status. So what it would suggest is that employers have to take infection prevention control procedures and policies and principles when they're in a healthcare setting. Because this is specifically limited to the workplace hazard in healthcare settings. And they are already doing that. And they're already required to do those things. That's why this is so hard for healthcare settings, is that they're forced to ignore standards of care. You know, in the Biden v. Missouri case, the Supreme Court recognized that vaccines are ubiquitous in American healthcare. And vaccine requirements are ubiquitous in healthcare. All right, but those are typically state law requirements, right? Typically, yes. All right, well, this state has a different view on that issue, it seems. Correct. And by virtue of that view has created workplaces that are less safe, which stands as an obstacle to the objectives of Congress in passing the OSHA Act in the first place. But we don't have anything specific in OSHA. No, although OSHA did try to, you know, when they tried with the NFIB case, when they tried to implement that broad standard, once that was pulled back, there was a memo issued by OSHA which said, we are going to be enforcing sort of the COVID prior emergency standard through the general duty clause, not the vaccination mandate, but the other implications through the general duty clause. Turning to equal protection, Sections 312 and 313 create classifications that affect similarly situated groups in an unequal manner. These statutes carve Montana's healthcare settings into three classes, exempted facilities, which are nursing homes, assisted living facilities, and long-term care facilities, healthcare facilities, including hospitals, and offices of private physicians. Because 312 treats these classes differently, it also treats the patients who seek care in those classes differently, and it also treats the nurses who provide care in those classes differently. The District Court did not commit a clear error in finding that these classes are similarly situated in all relevant respects. The District Court factually found that exempted facilities, healthcare facilities, and physician offices all provide healthcare, in some cases the same type of care in the same building. The District Court found that a Pelley Providence operates a medical facility that operates all three classes on the same physical campus, a hospital, an exempted facility, and a physician office. The District Court factually found that the staff and professionals move throughout those three different classes and that they actually share staff. I think the big issue here, right, is that we don't, you know, striking down state law classifications in the face of rational basis review is pretty rare. That's not something we customarily do. This is truly the example of a statute that fails rational basis scrutiny. Even if we take your point, which I asked the state about, that you could theoretically call these similarly situated, you still have to overcome this rational basis, and I think the state of Montana has given a number of reasons as to why there's a basis. What's the response to that? Is it irrational? All of those reasons are patently irrational. You cannot possibly be rational for the appellants to protect a particular patient in the exempted facility where she sleeps and then remove those protections the next day when she has to go to her cancer doctor or if she gets sicker and then has to be admitted to a hospital. That's patently irrational. These same facilities treat the same patients. 312 is antithetical to public health. It elevates individual autonomy over the public health and safety. And while they claim that exempted facilities treat a higher concentration of vulnerable patients, that's not demonstrated by the record, where the factual evidence actually showed that hospitals, which are not exempt, treat more complex and higher-risk patients. But we don't even need a record on this, right? We're allowed to hypothesize a rational basis? Correct. Yep. And regardless of whether it's the vulnerable patients that are protected within an exempted facility, those patients seek care in physician offices and in hospitals. There's no justification for appellants' view that exempted facilities should be allowed to protect vulnerable patients, but offices of private physician and the hospitals are not allowed to protect that same patient. It's further demonstrated by their argument that there was an assumption about what CMS was going to do and require vaccinations. That assumption is patently false and was patently false at the time because they chose to include assisted living facilities, which are undisputedly not subject to the conditions of participation from CMS. Assisted living facilities would have never been subject to CMS's vaccine mandate. Their enforcement actions further demonstrate the statute's irrationality. Appellants found that a prison was afforded the health care facility exception, but statutorily a physician's office is not. They found that a retreat for cancer survivors violated 312, concluding that a Zoom option for non-immunized attendees was unlawful discrimination akin to discrimination on the basis of race or sex. Because the stated interest fails to have a logical connection to the classifications and the impact of 312, the District Court appropriately concluded that it failed rational basis scrutiny and was unconstitutional. At the end of the day, the District Court, after a full trial on the merits, found that Montana Code Annotated 49.2.312 is fundamentally irreconcilable with federal law and thereby preempted. And the unconstitutional discrimination between the classifications that it draws fails to meet rational basis scrutiny. The District Court supported its permanent injunction on multiple grounds, appropriately applying typical preemption and constitutional principles to an atypical law. If any of those grounds was correct, and we maintain that they all were, then this Court must affirm the injunction. Thank you. Thank you. And we'll hear rebuttal. Thank you, Your Honors. So, starting at equal protection, I think Tucson Women's Clinic is instructive here. There, the State of Arizona drew distinctions on abortion providers, not even though those providers provided the exact same services to the exact same types of patients, but drew distinctions based on the size of the facilities and concerns over, I believe it was, administrative need. And so, this idea that states cannot regulate healthcare settings based on a single patient going between different healthcare settings, that's just contradicted by Tucson Women's Clinic. Second, the District Court did not enter factual findings as to, if you want to call it the relative number of immunocompromised patients treated by these facilities. And that's important, because the state's interest in treating nursing homes differently was that it's the combination of a highly vulnerable population in a congregate setting that sets them apart. And yes, we included the state-regulated facility-assisted living facility in that, because our state facility designation there shares those same characteristics. And on this, they don't attack that underlying regulatory scheme that treats hospitals differently than nursing homes differently than physician offices. They live and operate under it day to day. It's in this specific case that they're trying to attack it, but they don't, to be honest, I don't think the physician offices want that heavier-handed regulation that's imposed on healthcare facilities. That's because, as a matter of state regulation, we typically impose additional infection control policies on healthcare facilities. So I think turning to the 3B exception, it's been the state's view throughout this case that it's important to look at who the protection is intended to benefit. But I think when you look at 3BI and 3BII, the intended beneficiary of the protection is clearly patients, public, other employees. And that's the key here to looking at who the accommodation needs to go to, is that the legislature was clear on that point. On Ms. Page's testimony, I'll just point the court to 2ER at 80. Ms. Page was directly asked on cross-examination, did you ever request to be treated only by vaccinated staff? She affirmatively answered no. She also testified in that same dialogue that the reason she did not want to seek care, it was not because of the vaccination status of her providers, it was because of other sick patients in the waiting room. And I don't know that plaintiffs ever try and run against that testimony. And finally, on the ADA, the ADA does not guarantee a person's preferred accommodation, it guarantees a reasonable accommodation. And there is also a difference between effective and reasonable. A proposed accommodation can be effective, but nonetheless unreasonable. That's clear in the Title VII context in Peterson, that's clear in the Barnett case, that's clear in Willis. That if a proposed accommodation invades the rights of a third party, whether it's statutory or, I think in Willis, it was the collectively bargained rights, that is an unreasonable accommodation request. And so, finally, I'll just go back to, this court has to look at the face of the vaccination policies. The plaintiffs are trying to bring a unified case, but they ignore their internal discrepancies. The Montana Nurses Association collectively bargained for no mandatory vaccinations. Under their theory, that would mean they collectively bargained for a general duty clause violation. Providence recommended but did not require any vaccinations. Western Montana Clinic only recommended the influenza vaccine, but 702 does not prohibit recommending a vaccine. And Five Valleys relied on healthcare facilities to provide the relevant vaccination policy. So when you look at that universe, it undermines their entire theory of the case. So unless your honors have further questions. Thank you very much for your presentation. We thank both counsel for the helpful briefing and argument. This matter is submitted.
judges: McKEOWN, BYBEE, BRESS